

IN THE

# Court of Appeals of Indiana

Isaiah Jerone Stokes,

*Appellant-Defendant*



FILED

Feb 25 2026, 8:52 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

v.

State of Indiana,

*Appellee-Plaintiff*

---

February 25, 2026

Court of Appeals Case No.
25A-CR-531

Appeal from the Marion Superior Court

The Honorable Marie Kern, Judge
The Honorable James K. Snyder, Judge

Trial Court Cause No.
49D28-2307-F4-20724

**Opinion by Judge DeBoer**
Judge Altice concurs.
Judge Pyle dissents with separate opinion.

**DeBoer, Judge.**

## Case Summary

[1]     In July 2023, Indianapolis Metropolitan Police Department (IMPD) officer Brandon Brown was notified that a vehicle associated with Isaiah Stokes was traveling nearby.  Officer Brown knew Stokes had outstanding warrants for his arrest, so he followed the vehicle, which was eventually driven into a gas station and parked at a pump.  Stokes went inside the gas station and was arrested by Officer Brown on his way out.  After he spoke with the gas station attendant and determined the vehicle needed to be moved, Officer Brown initiated a tow.  Soon after, Officer Brown conducted an inventory search of the vehicle and found a handgun lying on the passenger seat.

[2]     The State charged Stokes with Level 4 felony unlawful possession of a firearm by a serious violent felon.  Before his trial, Stokes filed a motion to suppress the evidence obtained from the inventory search of the vehicle, which the trial court denied.  A jury found Stokes guilty of possessing a firearm, and he admitted he had previously been convicted of a serious violent felony.

[3]     On appeal, Stokes argues that the trial court abused its discretion by admitting the handgun and references thereto into evidence at trial.  He claims that the decisions to impound and inventory search the vehicle were pretextual and

violated his rights under the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. Concluding that the search complied with the federal and state constitutions, we affirm.

## Facts and Procedural History[1]

On July 20, 2023, while Officer Brown was patrolling in a marked cruiser, he received an alert that there was a black Chevy Equinox nearby associated with Stokes and registered to his girlfriend, Ebony Bass. The officer knew that Stokes had active warrants for his arrest. Officer Brown found the vehicle being driven by a male, later identified as Stokes, and he began surveilling it. After he pulled behind the vehicle, it turned a few times, made a U-turn, and then stopped at a Shell gas station pump. The officer pulled into a nearby service station to continue his observation and alerted his team when Stokes went into the gas station.

While Stokes was inside the gas station, Officer Brown pulled into the Shell parking lot, got out of his cruiser, and walked toward the entrance. Suppression State's Exhibit 1 at 00:25-00:50.[2] Stokes walked out as Officer Brown was

---

[1] We held a traveling oral argument in this case on January 20, 2026, at Arsenal Technical High School. We thank counsel for their quality written and oral advocacy and for braving the elements to present their oral arguments to our Court. We also extend our gratitude to Arsenal Tech for hosting the event as well as to the attendees for their thoughtful questions posed to the panel and counsel after the argument. Finally, we appreciate the opportunity we were given to share our Legal Futures program with the students over lunch.

[2] We refer to the conventional exhibits admitted by the State at the November 2024 suppression hearing as "Suppression State's Exhibit #," and thereafter refer to such exhibits as "Supp. State's Ex. #." We refer to exhibits contained in the single electronic exhibit volume prepared by the Marion County court reporter for purposes of this appeal as "Ex. at page #."

about to enter, and the officer immediately handcuffed him and informed him of the outstanding warrant. *Id.* at 00:50-1:15. After the arrest, which occurred at 6:05 p.m., Officer Brown went back to his cruiser and confirmed that Stokes was driving on a suspended license and had three active warrants, including ones for driving while suspended and unlawfully carrying a firearm. *Id.* at 1:35-3:35.

[6] After verifying this information, Officer Brown went into the gas station and asked the clerk if he wanted the vehicle towed because it was parked at a gas pump. Supp. State's Ex. 3 at 00:37. The clerk asked if anyone could move it, and Officer Brown responded that Stokes was being arrested and that he was by himself. *Id.* at 00:40-00:46. The clerk then inquired whether the police could move the vehicle. *Id.* at 00:49-00:53. When Officer Brown said they could not, the clerk agreed the vehicle should be towed. Transcript Vol. 2 at 45. Officer Brown believed the vehicle should be towed because it was rush hour at a busy gas station and leaving the vehicle there could have "cause[d] a backup for everybody . . . and cause[d] the business owners to lose money." *Id.* at 50-51.

[7] Officer Brown went back to his cruiser and discussed the situation with another officer. At 6:11 p.m., he recognized that Stokes' father was at the scene but did not inquire whether his father could move the vehicle. Supp. State's Ex. 3 at 2:26-2:37. Officer Brown called for a tow truck, told another officer that "with the last charge, [the vehicle] should be held[,]" and began filling out paperwork to effectuate the impoundment. *Id.* at 3:07-3:10. At 6:14 p.m., Stokes told the

officers that someone he was with was in the gas station.[3]  Supp. State's Ex. 5 at 4:14-5:20.  At 6:15 p.m., Officer Brown opened the driver's side front door of the Equinox and found a handgun lying on the passenger seat.  Supp. State's Ex. 3 at 6:23-6:40.  He returned to his cruiser to continue working on the paperwork while certified firearms liaison Officer Robert Camphor collected the loaded handgun from the vehicle.  A few minutes later, Officer Brown read Stokes his *Miranda* rights.

[8]     As Officer Brown prepared to continue inventorying the vehicle, a woman approached him and asked if the owner of the vehicle could come and get it.  *Id.* at 15:25-15:29.  He told her no and that the vehicle was going to be searched and towed because it contained a firearm and reeked of marijuana.  *Id.* at 15:29-15:40.  Although Stokes seemed to know this woman and she collected the phone and lottery tickets he had in his possession when he was arrested, she never claimed she was the owner of the vehicle.  Around this time, Stokes admitted to officers that he had taken the handgun out of the glove box and "set the gun right on the front seat."  *Id.* at 15:50-15:57.  By then, the tow truck had arrived, and the officers conducted a thorough search.  Later, as Stokes was about to get into the transport van, he repeated his admission to the police.

---

[3] Stokes suggests he was referring to Bass, the registered owner of the vehicle, but this cannot be clearly discerned from the record.  Even so, Officer Brown acknowledged at the suppression hearing that Bass did, at some point, speak with officers at the scene.  *See* Tr. Vol. 2 at 55.

Ultimately, instead of being towed, the vehicle was released to someone at the scene.

[9] The State charged Stokes with Level 4 felony unlawful possession of a firearm by a serious violent felon.[4] In October 2024, Stokes filed a motion to suppress the evidence obtained from the inventory search of the vehicle, alleging violations of both the state and federal constitutions.

[10] At the suppression hearing the next month, Officers Brown and Camphor testified consistently with the above information. Both officers stated that no one at the scene claimed to be the registered owner of the vehicle before it was inventoried. Officer Brown testified that, at some point, Bass was at the scene and spoke with the police, but the officer was not asked and did not volunteer who the vehicle was ultimately released to. Stokes' father testified that he was at the gas station when Stokes was arrested, and he was never asked if he could move the vehicle. He claimed that he and Bass told the officers that they could move the vehicle and that they had done so before it was searched.

[11] The State introduced IMPD General Order 7.3—IMPD's tow policy—without objection. *See* Ex. at 13. It states that "[i]t is the policy of IMPD to tow and impound vehicles only when authorized to do so, and to never use the towing of a vehicle as a pretext to search." *Id.* Pursuant to the policy, "[o]fficers have

---

[4] Ind. Code § 35-47-4-5(c). Originally, the State also charged Stokes with Level 5 felony possession of a narcotic drug, but in November 2024, the trial court granted the State's motion to dismiss this charge.

the authority to tow and impound vehicles when authorized by city ordinance or state statute, **or** as part of the officers' community caretaking function." *Id.* at 14 (emphasis added). The policy also governs the conduct of inventory searches, including the documentation of personal property. *See id.* at 17 (requiring the officer to make a "detailed listing of any item(s) of significant value found in the vehicle"). The policy goes on to reference City-County (Indianapolis-Marion County) Ordinance Section 611-204(a) under which an officer, "upon discovering a vehicle constituting a public nuisance, may cause the vehicle to be impounded[.]" *Id.* at 19. In pertinent part, Section 611-203(2) provides that a vehicle constitutes a public nuisance if the operator of the vehicle "is unable to move such vehicle by reason of his or her incapacity from injury or arrest."

[12] In December, the trial court denied Stokes' motion to suppress and then conducted a bifurcated jury trial. The State's first witness was Officer Brown. When the State attempted to admit his body camera footage showing the search of the vehicle, Stokes objected and was granted "a continuing objection as to the firearm[.]" Tr. Vol. 2 at 209. After the State rested, Stokes testified in his own defense and reaffirmed the admissions he had made at the scene.

[13] After the presentation of evidence, the jury found Stokes guilty of knowingly or intentionally possessing a firearm. Stokes waived his right to a jury on the second phase of the proceeding and admitted that he had previously been convicted of a serious violent felony. As a result of the jury verdict and his admission, the trial court found Stokes guilty of possessing a handgun as a

serious violent felon. The court sentenced Stokes to six years, with two years executed at the Department of Correction and four years suspended. Stokes now appeals.

## Discussion and Decision

## 1. Standard of Review

Stokes argues that the trial court erred in admitting "evidence regarding the handgun" because that evidence was obtained following an impoundment that violated both the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. Appellant's Br. at 9. Although Stokes filed a pre-trial motion to suppress, he appeals following a completed trial, so the relevant inquiry is whether the trial court abused its discretion by admitting the evidence at trial. *Washington v. State*, 784 N.E.2d 584, 586-87 (Ind. Ct. App. 2003). "A trial court abuses its discretion when its decision is clearly against the logic and effect of the facts and circumstances or when [it] has misinterpreted the law." *J.K. v. State*, 8 N.E.3d 222, 228 (Ind. Ct. App. 2014). While we defer to the trial court's factual findings regarding warrantless impoundments and inventory searches and overturn them only if they are clearly erroneous, *Wilford v. State*, 50 N.E.3d 371, 374 (Ind. 2016), "we review the trial court's ruling on the constitutionality of a search or seizure *de novo*." *Smith v. State*, 130 N.E.3d 1181, 1183 (Ind. Ct. App. 2019) (citing *Campos v. State*, 885 N.E.2d 590, 596 (Ind. 2008)) (italics in original).

Preliminarily, we note that the oral argument held in this case helped streamline our evaluation of the issues. At oral argument, the State abandoned multiple arguments it had made in its brief. The State conceded, among other issues, that (1) Stokes had not waived his appellate claims, (2) the vehicle at issue was never fully impounded (the tow was not completed), and (3) if any error occurred, it was not harmless.[5] With this information in mind, we now turn to the merits of the appeal.

## 2. Impoundment

"Both the Fourth Amendment and Article 1, Section 11 protect '[t]he right of the people to be secure in their persons, houses, papers, and effects' against unreasonable searches and seizures." *Wilford*, 50 N.E.3d at 374 (quoting U.S. CONST. amend. IV and IND. CONST. art. 1, § 11). While these state and federal constitutional provisions require separate analyses, the touchstone of each is reasonableness, and "[t]he State bears the burden of proving warrantless impoundments and inventory searches are reasonable under both the Fourth Amendment and Article 1, Section 11." *Id.* Although the following analysis deals primarily in Fourth Amendment jurisprudence, we find that our decision applies equally under Article 1, Section 11's totality of the circumstances test. *Id.* at 378 ("Article 1, Section 11 involves independent analysis, requiring this

---

[5] The State also conceded that it did not raise Indiana Code section 9-22-1-5 (granting officers authority to impound a vehicle found in the possession of someone other than the registered owner who cannot establish the right to possess the vehicle) as a statutory basis for impoundment before the trial court and that neither the plain view nor the search incident to arrest exception to the warrant requirement applies in this case.

Court to determine whether impoundment and inventory are reasonable under the totality of the circumstances."); *see also Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005) (recognizing "the reasonableness of the official behavior must always be the focus of our state constitutional analysis" (quoting *Moran v. State*, 644 N.E.2d 536, 541 (Ind. 1995), *reh'g denied*).

[17] "[W]hen police impound a vehicle and inventory its contents, they effect a search and seizure, and both measures must be reasonable—that is, executed under a valid warrant or a recognized exception to the warrant requirement." *Wilford*, 50 N.E.3d at 374. An inventory search is one exception to the warrant requirement because it serves an administrative rather than investigative function. *Id.* "[W]hen police lawfully impound a vehicle, they must also perform an administrative inventory search to document the vehicle's contents to preserve them for the owner and protect themselves against claims of lost or stolen property." *Id.* Thus, "the threshold question in inventory cases is whether the impoundment itself was proper." *Fair v. State*, 627 N.E.2d 427, 431 (Ind. 1993).

[18] "Impoundment is reasonable if it is authorized either by statute or the police's discretionary community-caretaking function." *Wilford*, 50 N.E.3d at 375. "Impoundment pursuant to statute is necessarily reasonable because the Legislature has deemed that citizens' privacy interests in their cars yield to State interests in those circumstances, making police inventorying a necessary collateral administrative function." *Id.* Discretionary impoundment, on the other hand, stems from the notion that "[c]ommunity safety often requires

police to impound vehicles because they are abandoned and obstruct traffic, create a nuisance, or invite thieves and vandals." *Id.* To avoid impoundment and inventories being used as a pretext "for a general rummaging in order to discover incriminating evidence[,]" the Indiana Supreme Court has established a two-prong test for determining when the decision to impound a person's vehicle pursuant to the police's community caretaking function is reasonable:

(1) Consistent with objective standards of sound policing, an officer must believe the vehicle poses a threat of harm to the community or is itself imperiled; *and*

(2) The officer's decision to impound adhered to established departmental routine or regulation.

*Id.* at 375-76 (citing *Fair*, 627 N.E.2d at 433) (emphasis in original).

[19]     As stated above, the State conceded at oral argument that the vehicle at issue was not impounded. At this point, we pause to clarify that the police's failure to fully effectuate a vehicle impoundment (take custody of the vehicle *and* complete a tow)[6] is not fatal to the State's claim that impoundment was reasonable. Rather, the impoundment inquiry centers on the reasonableness of the officer's *decision to impound*. Indeed, in *Wilford*, the Supreme Court's impoundment analysis focused on the reasonableness of the "decision to impound[.]" *Id.* This is consistent with *Fair*'s rationale that the failure to

---

[6] Indianapolis-Marion County municipal code Section 611-202 defines impoundment as "the act of taking temporary custody of a vehicle **and** towing it[.]" (emphasis added).

complete impoundment was a factor suggestive of a pretextual search rather than a fatal flaw in the impoundment inquiry. *See Fair*, 627 N.E.2d at 436.

[20] The dissent wants to make a bright line rule that for a lawful impoundment the police must take custody of a vehicle *and* complete a tow (by removing the vehicle to an impound lot). We respectfully disagree with the dissent's position that proper impoundment under the Fourth Amendment mandates completion of the tow. First, we note that the dissent did not address with our analysis—rooted in *Fair* and *Wilford*—that a lawful decision to impound is sufficient to satisfy the State's burden to prove a reasonable impoundment, and that the failure to effectuate a tow functions as one factor that may indicate pretext rather than a hard line under the Fourth Amendment.

[21] Second, we disagree with the assertion that our position has never been reflected in Indiana case law. We've made clear we believe our Supreme Court has provided direction in this area, and indeed, this Court has recognized the same. In *Widduck v. State*, an officer conducted a traffic stop on a vehicle without a license plate containing a driver who had no registration. 861 N.E.2d 1267, 1269 (Ind. Ct. App. 2007). The officer made the decision to tow the car and then searched it and found drug paraphernalia. *Id.* However, after assessing the scene and the driver's cooperation—reasons that are far more ripe for abuse than policy-mandated release to the owner—the officer let the driver drive his car from the scene. *Id.* When the driver appealed his conviction for possession of paraphernalia, a panel of this Court considered the case a "close call," but reasoned that the officer's decision not to effectuate a tow did not

render the search unreasonable under the Fourth Amendment because it was not pretextual. *Id.* at 1270-71; *see also Barber v. State*, No. 22A-CR-258, at *3 n.1 (Ind. Ct. App. Aug. 31, 2022) (mem.) (noting appellant's argument that the inventory search was invalid because the vehicle was not towed and reasoning that *Fair* instructs that such evidence raises questions about pretext rather than meaning the search was necessarily invalid).

[22] Finally, the dissent seems to ignore the evidence here suggesting the police did "follow[] standardized procedures" in not towing the vehicle. *Colorado v. Bertine*, 479 U.S. 367, 372 (1987). The IMPD's tow policy requires officers to release an impounded vehicle—even if it is already on the tow truck—to the registered owner if they are on scene or to another individual at the direction of the owner. It was not unreasonable for the trial court to find that the officers adhered to that very procedure. While courts are afforded the benefit of hindsight, officers must make decisions based on information available to them at each moment. And the dissent's bright line rule—requiring a completed tow for an inventory search to be constitutionally reasonable—would not allow law enforcement to change course in light of changed circumstances they cannot foresee when making the initial decision to impound a vehicle.

[23] Moving on, Stokes maintains the State did not prove the impoundment was authorized by statute *or* a valid exercise of the officers' community caretaking function. *See Deaton v. State*, 203 N.E.3d 1107, 1113 (Ind. Ct. App. 2023) (clarifying that impoundment is proper when done pursuant to statute *or* the community caretaking function), *trans. denied*. But we find that Indianapolis-

Marion County municipal code Sections 611-203 and 611-204 rendered impoundment reasonable under the circumstances.[7] Section 611-203 provides multiple circumstances under which a vehicle constitutes a public nuisance, including that the operator cannot move the vehicle by reason of his arrest. Section 611-204, in turn, provides that "[a]ny officer . . . , upon discovering a vehicle constituting a public nuisance, may cause the vehicle to be impounded[.]"

[24]    Stokes argues "that the arrest of the operator alone [cannot] justify impoundment of the vehicle." Appellant's Br. at 12. However, he cites inapposite case law to support this argument,[8] and his claim that the ordinances' purpose mandates this conclusion is likewise unpersuasive. Section 611-201 specifies that the purpose of the impoundment ordinances is "to authorize the impoundment of vehicles that, *due to* their location or condition,

---

[7] At the suppression hearing, Stokes' attorney correctly noted that the "municipal code does not obviate the need for constitutional reasonableness. We can't legislate away peoples' rights. There's supremacy for that reason." Tr. Vol. 2 at 86. However, on appeal, Stokes does not argue the Indianapolis-Marion County municipal code is not a valid legislative authority under which impoundment could be authorized nor does he otherwise challenge the constitutionality of the ordinances. For these reasons, and because it does not impact our ultimate judgment, we assume for purposes of this appeal that these ordinances could serve to authorize impoundment.

[8] To support his argument that the arrested "status of the driver alone" cannot justify impoundment, Stokes cites *Edwards v. State* and *Vehorn v. State.* Appellant's Br. at 12; 762 N.E.2d 128 (Ind. Ct. App. 2002), *aff'd on reh'g*, *trans. denied*; 717 N.E.2d 869 (Ind. 1999). However, while impoundment was statutorily required in *Edwards* and the fact that the defendant was arrested in a vehicle that was reported stolen justified impoundment in *Vehorn*, these cases do not say that statutes may not authorize impoundment due to a driver's arrest. 762 N.E.2d at 132-33; 717 N.E.2d at 875. To the extent that Stokes argues the statute had to *require* impoundment, the State correctly calls this argument a "red herring" because *Wilford* states that impoundment is necessarily reasonable if **authorized**, rather than required, by statute. Appellee's Br. at 19; *see Wilford*, 50 N.E.3d at 375.

or which have been involved in violations of law, constitute a threat to the health, safety or welfare of the community or warrant temporary custody by the police[.]" (emphasis added). Stokes claims this means that police must "find a threat to the health, safety or welfare of the community" before a vehicle may be impounded as a public nuisance. Appellant's Br. at 12. But we read Section 611-203 to enumerate various situations determined to be in line with this purpose and Section 611-204 to authorize impoundment when such circumstances apply. Thus, because Stokes could not move the vehicle due to his arrest, Officer Brown was authorized to impound it under these ordinances. However, even if Stokes is correct that the ordinances' purpose imputes additional requirements for impoundment to be authorized, that purpose is met when the circumstances "warrant temporary custody [of the vehicle] by the police," which occurred here when Stokes was arrested outside of a busy gas station while his vehicle was parked at a gas pump.

[25] Separately, we find that impoundment was authorized under the police's discretionary community caretaking function. The IMPD tow policy established procedures for towing under the community caretaking function which were consistent with the function as articulated in case law. To guide an officer's assessment of whether a vehicle presents a threat or harm to the community, the policy instructs the officer to consider the nature of the property upon which the vehicle is situated and the length of time he reasonably expects the vehicle to be left unattended. *See* Ex. at 14. In this case, Officer Brown lawfully arrested Stokes, a suspended driver, at a busy gas station during

rush hour. *See id.* at 15 (tow policy stating that if statutory or community caretaking authority exists, police may tow vehicles operated by suspended drivers or persons under custodial arrest). The gas station clerk wanted the vehicle to be moved, and Officer Brown testified that leaving the vehicle unattended at the gas pump could have "cause[d] a backup" for customers and led the "business owners to lose money." Tr. Vol. 2 at 50-51. He and Officer Camphor both testified that no one approached them claiming to be the registered owner of the vehicle before it was searched. Under these circumstances, it was reasonable for the officers to determine that the vehicle posed a threat or harm to the community and their decision to impound adhered to established departmental policy. *See Farris v. State*, 144 N.E.3d 814, 823 (Ind. Ct. App. 2020) (finding the same where police stopped a vehicle on a busy two-lane road around the time school let out and the driver could not provide proof of insurance), *trans. denied*.

[26] That said, even when an officer's decision to impound is lawful—pursuant to statutory authorization or circumstances warranting discretionary impoundment—courts must still consider whether that decision and the resulting inventory search were a mere pretext to forage for incriminating evidence, a motivation anathema to the rationale behind the inventory search exception to the warrant requirement. In other words, police may not use a lawful impoundment as a pretext to search. And when the transaction reveals itself as pretextual, which the court may come to conclude when analyzing law enforcement's inventorying procedures and compliance therewith, the entire

transaction is rendered constitutionally unreasonable. Indeed, *Fair* noted that "the ultimate character of [a] search is often most clearly revealed when both the necessitousness of the impoundment and the scrupulousness of the inventorying are viewed together." 627 N.E.2d at 431, 436 (outlining "several indicia of pretext[,]" including facts related to the impoundment). With that in mind, we turn to whether the State carried its burden to show the inventory search at issue was reasonable.

## 3. Inventory Search

As we have alluded, even when impoundment is lawful, the State must establish the reasonableness of the inventory search itself. *Deaton*, 203 N.E.3d at 1113. This step ensures that the inventory was not pretextual. *Id.* "[T]o defeat a charge of pretext[,] the State must establish the existence of sufficient regulations and that the search at issue was conducted in conformity with them." *Weathers v. State,* 61 N.E.3d 279, 287 (Ind. Ct. App. 2016) (quoting *Fair*, 627 N.E.2d at 435).

In *Fair*, the Supreme Court identified numerous indicia of pretext that, when present, may call into question whether an inventory search was conducted in good faith, including if: (1) "[t]he search was conducted not at the impoundment lot but at the scene of the crime[,]" (2) "[t]he inventory was conducted by an officer responsible for criminal investigations and not the custody of impounded property[,]" (3) formal inventory paperwork was not completed, (4) the officers did not note the defendant's personal effects "but

instead focused only on the contraband[,]" (5) the car was never actually impounded, and (6) police department policy and compliance therewith was "not established in sufficient detail by the record." 627 N.E.2d at 436.

[29] Before we consider whether any of these indicia of pretext were present here, we must discuss two factual issues related to the officers' decision not to complete the tow. As we stated above when addressing the dissent's position on impoundment, although a tow was initiated and the tow truck came to the scene, the police ultimately reversed course and released the vehicle to someone at the scene. Admittedly, the record does not show with certainty whom it was released to. Officer Brown was not asked to give this information and did not volunteer it, and Officer Camphor did not know whom the vehicle was released to. However, Officer Brown acknowledged that Bass was at the scene and that she spoke with another officer, Sergeant Tyler Watson, at some point during the towing process. *See* Tr. Vol. 2 at 55. Bearing that fact in mind, we note that the IMPD tow policy states:

> When towing under the authority of the community caretaking function, the vehicle must be released by the contract wrecker, even if hoisted or attached to the wrecker, when:
>
> 1. The owner of the vehicle is on scene and is in possession of a valid driver's license;
>
> . . .

3. The owner of the vehicle arrives on scene and authorizes the release of the vehicle to another, properly licensed, person on the scene.

Ex. at 16. Given Bass' presence at the scene and that the policy required release to the owner when towing under the community caretaking function—and nothing mandating otherwise when towing pursuant to the ordinances at issue—the trial court could have reasonably inferred that the officers released the vehicle to Bass. *See Wilford*, 50 N.E.3d at 374 (stating that we review the evidence favorable to the trial court's decision and resolve all disputes in favor of the ruling); *see also* Tr. Vol. 2 at 90 (the court stating that the officers may have "ultimately realized that the owner of the vehicle [was] on the scene and [] release[d] it"). Additionally, contrary to Stokes' father's testimony, the trial court could have found that Bass did not approach the police and ask to move the vehicle before it was searched. *See* Tr. Vol. 2 at 90 (defense counsel acknowledging it "wasn't clear" when Bass spoke to Sergeant Watson).

[30] While resolution of these facts contextualizes some of the officers' conduct, we acknowledge that this search was not entirely unassailable. Looking at the pretext factors identified in *Fair*, we first note that the search was conducted at the scene of the arrest rather than the impoundment lot. While in many cases this may indicate pretext, the officers here were following standard procedure when they did so because their tow policy states that "an inventory search will be conducted prior to impoundment[.]" Ex. at 17. As for the second factor (whether an investigating officer conducted the search), we acknowledge that

Officer Brown conducted the inventory search right after surveilling and arresting Stokes. Officer Brown served on the "Violence Reduction Team[,]" which "deal[t] with [] targeted violent crime, [] mostly for shots fired and gun offenses[,]" and had investigated Stokes in the past and knew he had active warrants. Tr. Vol. 2 at 35. However, this was not per se indicative of pretext under the present circumstances: since departmental policy required impounded vehicles to be inventoried before being towed, it is not surprising that an officer involved in arresting Stokes conducted the search.

[31] Regarding the third and fourth factors (whether formal paperwork was completed and the focus of the search), Officer Brown testified at trial that the purpose of inventorying the vehicle was to protect the officers and "make sure everything [was] accounted for[,]" and the body camera video shows the officers conducted themselves accordingly. Tr. Vol. 2 at 210. Officer Brown spent a substantial amount of time completing paperwork related to the tow and inventory. He also made sure Stokes' phone and lottery tickets were left with someone Stokes knew, and while he was working with that woman to complete paperwork, Officer Camphor counted Stokes' cash in front of him to ensure it was properly accounted for. *See* Supp. State's Ex. 5 at 28:02-29:00. The fact that the State did not introduce a completed tow slip or inventory documentation at the suppression hearing is not suggestive of pretext given that the officers showed attention to detail regarding documentation and the vehicle was likely released to Bass at the scene.

[32] Moreover, while Officer Brown's body camera video does not show him actively documenting Stokes' personal property when he thoroughly inventoried the vehicle, the tow policy only required "a detailed listing of any item(s) of significant value." Ex. at 17. The policy defines "Item(s) of Significant Value" as those "which exceed[] one hundred dollars [] in the reasonable approximation of the officer; or a collection of similar items the value of which exceeds one hundred dollars [] in the reasonable approximation of the officer[.]" *Id.* at 13. Policies permitting officers "to inventory for valuables" are generally permissible when "defin[ed] by standardized criteria[.]" *Sams v. State*, 71 N.E.3d 372, 380 (Ind. Ct. App. 2017); *see also Sansbury v. State*, 96 N.E.3d 587, 593 (Ind. Ct. App. 2017) (reversing a conviction after officers only focused on valuable items during their inventory search despite IMPD's prior version of the tow policy requiring them to list *all* personal property discovered during an inventory). Stokes does not argue the Equinox contained personal property of significant value. Additionally, the body camera video shows the officer sifting through trash or items of nominal value during the inventory. Given the nature of the property in the vehicle and the policy requiring documentation of items of significant value, the lack of evidence that property was documented throughout the inventory is understandable, not evidence of pretext.

[33] As to the fifth factor, the police's decision to reverse course and not fully effectuate the impoundment could be explained by the fact that the owner of the

vehicle had not clearly identified herself to officers before the decision to impound had been made and the vehicle was inventoried.

[34] Finally, as for the IMPD's regulations and the officers' compliance therewith, unlike in *Fair* and *Wilford*, the State did produce a written tow policy, and Officer Brown testified about his interpretation of and compliance with certain provisions. *See Wilford*, 50 N.E.3d 377 (noting the State must establish the particulars of the departmental impound policy, which can be accomplished through officer testimony). The IMPD tow policy states that "[a]ny vehicle . . . that is impounded must have a completed Tow Slip." Ex. at 16. It also provides that "[a]ll items of significant value discovered during an inventory search . . . will be listed in the officer's personal notebook, the tow slip, or in an incident report." *Id.* at 17. As shown, the officers substantially observed these protocols and the release of the vehicle explains why the actual documentation was not admitted into evidence. *See Sams*, 71 N.E.3d at 377-78 ("[W]e approve searches [conducted under a valid protocol] and tolerate minor deviations from it."); *see also Whitley v. State*, 47 N.E.3d 640, 648 (Ind. Ct. App. 2015) (IMPD officers' failure to document all items found in a vehicle as required by policy did not render the search pretextual), *trans. denied*; *Jackson v. State*, 890 N.E.2d 11, 19 (Ind. Ct. App. 2008) (finding the inventory search reasonable despite the police's failure to "thoroughly follow[]" policy). Indeed, at the suppression hearing, when defense counsel argued that the lack of documentation admitted into evidence indicated the impoundment and search were pretextual, the court noted the body camera video showed Officer Brown "literally taking a triplicate

piece of paper that is a tow [] slip," and the vehicle being released alleviated the need for the officers to complete the tow slip. Tr. Vol. 2 at 89.

[35]    Notwithstanding the above analysis which, on balance, weighs against a finding that the search was pretextual, Stokes claims that additional facts reveal a pretextual motive. For one, Officer Brown identified Stokes' father at the scene before the inventory was conducted yet made no effort to determine whether he could have moved the vehicle. The police also failed to investigate Stokes' claim that someone he was with was inside the gas station. But whether a driver who cannot move his vehicle should be given an opportunity to contact a friend or relative to do so depends on the circumstances. *See Jones v. State*, 856 N.E.2d 758, 762 (Ind. Ct. App. 2006) (noting impoundment cases stating police should have given the driver an opportunity to contact a friend or family member to move a vehicle under circumstances where the vehicle was "safely parked in [a] parking lot[] or on private property"), *trans. denied*; *see also Taylor v. State*, 842 N.E.2d 327, 333 (Ind. 2006) (finding a defendant found driving with a suspended license should have been given the opportunity "to telephone a responsible friend or relative to retrieve his car" because officers had no authority to arrest him for committing a driving infraction). Here, where the officers lawfully arrested Stokes on multiple outstanding warrants, knew he was not the registered owner of the vehicle, and made a reasonable decision to impound the vehicle under the Indianapolis-Marion County municipal code as well as the community caretaking function, they did not need to give Stokes'

father the opportunity to move the vehicle or further investigate whether the registered owner of the vehicle was somewhere in the vicinity.

[36] Stokes also finds troubling that Officer Brown told another officer that "with the last charge, [the vehicle] should be held" around the time he called for a tow truck. Supp. State's Ex. 3 at 3:07-3:10; *see also* Supp. State's Ex. 1 at 3:15-3:29 (Officer Brown confirming Stokes' warrants and noting his gun charge last). He argues that this statement is direct evidence of pretext. *See* Appellant's Br. at 16 (noting this comment and reasoning that "it isn't necessary to speculate whether Officer Brown was just using the decision to tow the car as a pretext to search it."). On this issue, we find instructive this Court's decision in *Bartuff v. State*, 706 N.E.2d 225 (Ind. Ct. App. 1999). There, a state trooper stopped the defendant's vehicle for traffic violations and then learned that his driver's license had been suspended. *Id.* at 227. The defendant accompanied the officer to his cruiser and appeared "very nervous" when the officer asked him questions about "whether he had any drugs or firearms in his vehicle." *Id.* The officer later admitted he "felt certain the vehicle contained drugs or other contraband," and he attempted to secure the defendant's consent to search the vehicle and called for a drug-sniffing dog before deciding to impound the vehicle due to its position near an intersection. *Id.* at 227, 229. Although the appellate panel found impoundment was warranted, it reasoned that various facts regarding the conduct of the search, together with the trooper's statements and actions indicating he intended to look for evidence of criminal activity, "demonstrate[d] that the 'inventory' search was mere pretext[.]" *Id.* at 229.

Here, in contrast, Officer Brown's one-off comment about holding the vehicle because of a charge is not concrete enough for us to declare the inventory search pretextual, especially considering the ordinances authorized impoundment upon the arrest of the operator and the search itself was conducted with only minor deviations from departmental policy.

[37] In the end, we conclude that the inventory search of the vehicle did not violate Stokes' rights under the Fourth Amendment. The impoundment was authorized by the Indianapolis-Marion County ordinance and the police's community caretaking function, and the inventory search was conducted largely in conformity with the IMPD tow policy. For the same reasons, under Article 1, Section 11 of the Indiana Constitution, we conclude that the impoundment and inventory were reasonable under the totality of the circumstances.

## Conclusion

[38] For the foregoing reasons, we conclude the trial court did not err in admitting evidence related to the firearm, and we affirm Stokes' conviction.

[39] Affirmed.


Altice, J., concurs.
Pyle, J., dissents with separate opinion.

ATTORNEYS FOR APPELLANT

Talisha Griffin
Marion County Public Defender Agency
Indianapolis, Indiana

Jan B. Berg
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General
Indianapolis, Indiana

Michelle Hawk Kazmierczak
Deputy Attorney General
Indianapolis, Indiana

**Pyle, Judge, Dissent with opinion.**

[40] I respectfully dissent from my colleagues' conclusion that the impoundment and inventory search of the vehicle were reasonable under the totality of the circumstances. The facts clearly demonstrate, and the State conceded at oral argument, that the vehicle was *not* impounded. Therefore, the resulting search cannot fit within the confines of the inventory exception. I believe my colleagues' decision rests upon a form of legal gymnastics that ignores the facts, frustrates the purposes behind the inventory exception, reduces Hoosiers' protections under the Fourth Amendment by failing to follow established case law, and invites the potential for abuse.

[41] The practice of inventory searches was largely ignored by the United States Supreme Court until its decision in *South Dakota v. Opperman*, 428 U.S. 364 (1976). In that case, an officer observed a vehicle parked in violation of local parking ordinances. A few hours later, two citations were issued. After several hours, a decision was made to tow the vehicle. Following established procedures, an officer inventoried the contents of the vehicle before it was towed and discovered marijuana in the glovebox. The owner of the vehicle was subsequently charged with possession of marijuana. Following an unsuccessful attempt to suppress the evidence, the driver was convicted.

[42] On appeal, the U.S. Supreme Court held that *when* police officers impound a vehicle, they may, subject to established procedure, conduct an inventory search of the vehicle without violating the warrant requirement of the Fourth

Amendment. *Opperman,* 428 U.S. at 375-76. The purpose behind allowing inventory searches was "developed in response to three distinct needs: the protection of the owner's property while it remains in police custody . . . ; the protection of the police against claims or disputes over lost or stolen property . . . ; and the protection of the police from potential danger . . . ." *Id*. at 369 (internal citations omitted).

[43] Since *Opperman*, the United States Supreme Court, the Indiana Supreme Court, and this Court have clarified the bounds of the inventory exception. In each case, courts have held that a lawfully impounded vehicle was a condition precedent to a valid inventory search.

[44] For example, in *Colorado v. Bertine*, 479 U.S. 367 (1987), police arrested a driver of a vehicle for operating while intoxicated. The driver "was taken into custody and before the arrival of a tow truck to take [his vehicle] to an impoundment lot, a backup officer inventoried the contents of the v[ehicle]*." Bertine*, 479 U.S. at 368-69 (footnote omitted). The search of a backpack inside the vehicle revealed the presence of drugs and associated paraphernalia. The vehicle was towed to an impound lot, and the driver was charged with drug offenses. Prior to trial, the driver successfully sought the suppression of the evidence. On appeal by the State, the Supreme Court of Colorado upheld the suppression of the evidence, but the U.S. Supreme Court reversed.

[45] In that case, the United States Supreme Court noted that inventory searches are administrative and that police must follow standardized procedures. *Id*. at 372.

Further, the Court explained that, when police *actually impound* vehicles, they are

> potentially responsible for the property taken into their custody. By securing the property, the police protect[] the property from unauthorized interference. Knowledge of the precise nature of the property help[s] guard against claims of theft, vandalism, or negligence. Such knowledge also help[s] . . . avert any danger to police or others that may . . . be[] posed by the property.

*Id*. at 373. In addition, the Court addressed Bertine's argument that the standardized procedure relied upon by police in that case was unconstitutional because it gave police the discretion to park and lock the vehicle in a public parking area. The Court noted that nothing in *Opperman* prohibits police from exercising discretion in deciding whether to impound a vehicle as long as they act in accordance with standardized procedures. *Id*. at 375-76. However, because the police in *Bertine* decided to follow established procedure to *actually impound* the vehicle and there was no evidence of a pretextual search, the inventory exception applied.

[46] In Indiana, our appellate courts, following established precedent, have long held that the U.S. Supreme Court has "defined what has become known as the 'inventory exception' when it held that the police may conduct a warrantless search of a lawfully *impounded* automobile if the search is designed to produce an inventory of the vehicle's content." *Fair v. State*, 627 N.E.2d 427, 430 (Ind. 1993) (emphasis added). In addition, we have specifically held that "the threshold question in inventory cases is whether the *impoundment* itself was

proper." *Id*. at 431 (emphasis added). *See also Wilford v. State*, 50 N.E.3d 371, 374 (Ind. 2016) (holding that proper impoundment is the threshold question to a valid inventory search); *Berry v. State*, 967 N.E.2d 87, 90 (Ind. Ct. App. 2012) (defining an inventory search as a warrantless search of a lawfully *impounded* vehicle); *Farris v. State*, 144 N.E.3d 814, 822 (Ind. Ct. App. 2020) (holding that an inventory search is only proper when a vehicle is lawfully impounded), *trans. denied*.

[47] The plain text in these and other cases covering the inventory exception make clear that a condition precedent to a valid inventory search is the actual impoundment of the vehicle. To hold otherwise frustrates the purposes behind allowing a warrantless inventory search: (1) protecting the seized property; (2) reducing the risk of false claims of theft or damage; and (3) protecting others from dangerous instrumentalities. *See Opperman*, 428 U.S. at 369. I am unable to find an Indiana case where we have allowed the admission of evidence under the inventory exception when police had not actually impounded the vehicle. The inventory exception to the warrant requirement does not contemplate allowing the police to reap the benefits of completing an inventory search without impounding the vehicle they searched. I believe my able colleagues' deviation from established precedent improperly expands the inventory exception, thereby reducing Hoosiers' protection under the Fourth Amendment. Only a little imagination is necessary to think of scenarios for abuse. As a result, I would reverse the trial court's decision to admit the handgun into evidence.